## CARTER v. BOGDEN.

### In re WESTON-HANSEN, Inc.

(Circuit Court of Appeals, Eighth Circuit. May 8, 1926.)

No. 6888.

**1. Bankruptcy ⊂⇒345—Claims of innocent creditors of bankrupt corporation entitled to preference over those of stockholders deceived by its officers.**

Any one becoming a creditor of a corporation has a right to rely on the security afforded by the money or assets paid in by the stockholders for its capital stock, and in a proper case equity will prefer the claims of innocent general creditors over claims of stockholders who may have been deceived by officers of the corporation.

**2. Bankruptcy ⊂⇒340—As respects priority of claims, sale of property on credit to a corporation at such known overvaluation as to render it insolvent is evidence tending to prove fraud of seller.**

As respects priority of claims, the sale of property on credit to buyers who were required

to turn it over to a new corporation to be organized by them, at such an overvaluation, known to the parties, as to render it insolvent ab initio, *held* evidence of fraud on the part of the seller.

**3. Bankruptcy ⊂⇒345—Claim for price of stock of merchandise sold on credit to corporation, and which constituted its sole original assets, at such an overvaluation as to render it insolvent ab initio, deferred, until payment of claims of subsequent creditors.**

Claimant sold his business and his stock of merchandise, worth not exceeding $9,000, for the agreed price of $25,000, of which $8,000 was paid and the remainder evidenced by notes. The contract required the purchasers to organize a corporation to continue the business, to which the property should be conveyed, in consideration for which it was to assume payment of the notes and issue all its stock to the purchasers, who were to pledge it to claimant. *Held* that, since the large overvaluation of the property, which was known to the parties, made the corporation insolvent in its inception, on its bankruptcy, payment of claimant's notes should be deferred until after payment of all commercial creditors, whose claims arose in the subsequent conduct of the business.

Appeal from the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

In the matter of Weston-Hansen, Inc., bankrupt; A. E. Bogden, trustee. A. S. Carter appeals from an order disallowing his claim in part. Remanded, with instructions to modify.

This appeal is to review order of trial court as to claim of appellant, allowed in part and disallowed in part. Weston-Hansen, Inc., a corporation, was adjudged a bankrupt, and appellee appointed trustee. Appellant A. S. Carter filed a claim as unsecured against said estate in the sum of $16,-895.20. Objection being interposed by appellee and certain creditors, on hearing, referee allowed same, in sum of $2,800, and disallowed balance, in the sum of $14,895.20. On petition to review, prosecuted by appellant, the appellee not seeking a revisal of such order, the court confirmed action of referee, and an appeal therefrom was duly prosecuted to this court. For more than 33 years appellant had been engaged in business of retail sporting goods and electrical supplies, and manufacture and sale of rubber stamps, badges, etc. Harvey F. Hansen having been in his employ for two years in capacity of bookkeeper and salesman, and in his absence having charge of said business, was fully acquainted with its assets. In early part of 1922, Hansen, having interested R. G. Weston with him, opened up negotiations with appellant for purchase of said business, in-

cluding assets, extending over period of 10 days, during which he had access to his books and stock. As result of said negotiations a contract in writing was entered into, under date of March 8, 1922, between appellant and Weston and Hansen, by which was sold to said Weston and Hansen said business, including certain assets, for sum of $25,000, of which $8,000 in cash and property was then paid; the balance, in sum of $17,000, to be paid in seven deferred equal annual installments. The terms and conditions of said contract were as follows:

"First. The entire purchase price to be paid by second parties to first party for said business in the sum of twenty-five thousand dollars ($25,000.00), to be paid as follows:

"(a) Six thousand dollars cash in hand upon the execution of this agreement. * * *

"(b) As payment of $2,000. * * *

"(c) The balance of said purchase price, to wit, the sum of $17,000, shall be paid in seven equal installments of two thousand four hundred twenty-eight dollars and fifty-seven cents ($2,428.57) each, which said installments shall be payable on or before the 8th day of March of the years 1923, 1924, 1925, 1926, 1927, 1928, and 1929, respectively, together with interest on said deferred payments, or any balance thereon existing, from month to month, at the rate of 7 per cent. per annum, payable monthly.

"Second. Parties of the second part agree to forthwith cause to be incorporated, under the laws of the state of Colorado, a company, under the name of 'A. S. Carter, Inc.,' in which company second parties shall be officers and directors, and to sell, transfer, and set over to said company, subject to the terms of this agreement, and the indebtedness herein provided for, which said company shall assume, the business so purchased from first party, in consideration óf the issuance to them of the entire capital stock of said corporation. And it is hereby covenanted and agreed that second parties shall thereupon immediately assign to the first party all of said capital stock so issued as aforesaid, in pledge to secure the payment to first party of the said deferred payments, representing the unpaid balance of the purchase price for said business, to wit, the sum of $17,000 and interest, and to cause to be noted upon the stock books of said company the pledging of said stock, as aforesaid, as by law required.

"Third. Parties of the second part further agree to and with party of the first part that no liability nor indebtedness shall be incurred in the conduct and operation of said business which shall exceed at any one time the aggregate sum of $2,500, and that the by-laws of said company, to be so incorporated as aforesaid, shall contain a provision that no liability nor indebtedness shall be incurred by the company, its officers, directors, or agents, which shall exceed at any one time the said aggregate sum of $25,000, and which said provision shall by its terms be irrevocable until the balance of said purchase price of $17,000, and all interest thereon, shall have been fully paid and satisfied. It is further agreed that, for the better conservation of the assets of said company, and to better secure the payment of said indebtedness to first party, parties of the second part, as officers of said company, shall receive as salaries a sum not to exceed $40 per week, and that the board of directors of said company shall adopt a resolution so fixing said salaries, which shall be irrevocable until the indebtedness to first party shall have been fully paid and satisfied, without the written consent of first party first had and obtained.

"Fourth. Parties of the second part further agree to keep said stock of goods, fixtures, and machinery insured for the benefit of first party, in some good, reliable insurance company or companies, in the sum of not less than $12,000, and to cause a proper clause to be attached to the policy or policies of insurance, acknowledging notice by said insurance company or companies, and acceptance by it or them of the pledging of said insurance to first party, as additional security for said unpaid balance of said purchase price, and shall deliver said policy or policies of insurance to first party. Parties of the second part further agree to forthwith have issued to each of them a policy upon their respective lives, payable to their estate, in the sum of seventy-five hundred dollars each, and to assign said policies to the party of the first part as additional security for said indebtedness. * * *

"Sixth. It is further agreed that parties of the second part shall promptly pay all premiums as they become due on the policies of insurance above mentioned, and that, in event of their failure so to do, party of the first part may, at his option, either pay said premiums so becoming due, in which event the amount so paid shall become a part of the principal sum remaining unpaid, on said purchase price, * * * or he may immediately declare the unpaid balance of said deferred payments and interest thereon due and payable at once, without further notice to

second parties, and proceed to foreclose the pledge of securities herein provided for.

"Seventh. It is agreed that parties of the second part shall render regular monthly statements to party of the first part, showing the financial condition of said business, upon the 1st of each and every month, until said unpaid portion of said purchase price has been fully paid, and shall, upon the request of the first party, furnish first party any information desired by him concerning said business and its financial condition, at any time until said balance has been fully paid.

"Eighth. It is further understood and agreed that, except as in this paragraph otherwise provided, none of the lines of merchandise now handled and dealt in by first party, and none of the lines of manufacturing now engaged in by him, nor the right to handle or manufacture said lines, shall be closed out, nor shall the business of selling and manufacturing any of said lines be sold or disposed of, until the balance of the unpaid purchase price above mentioned, and all interest thereon, has been fully paid and satisfied, without the written consent of first party, first had and obtained: Provided, however, that the line of lighting fixtures now handled by first party may be closed out and not dealt in; and provided, further, that any 'dead,' shopworn, out of date, or obsolete stock now on hand may be disposed of to the best advantage, in order that room may be provided for the replacement thereof by salable merchandise. * * *

"Fourteenth. Party of the first part hereby agrees to and with parties of the second part that he will not, either directly or indirectly, engage in the state of Colorado in the same line of business as that hereby sold by him to parties of the second part, for a period of five years: Provided, however, that this provision shall not apply to nor affect the right of first party to engage in the manufacture and sale of Neighbors of Woodcraft and W. O. W. emblems and badges.

"Fifteenth. It is distinctly understood and agreed by the parties hereto that time is of the essence of this contract, and that, if parties of the second part shall fail to make any of the payments herein provided upon their part to be made, promptly when due, or shall fail to comply with and perform the covenants and conditions herein contained upon their part to be complied with, done, and performed, the party of the first party may at his option declare the whole of said indebtedness due and payable, at once, without further notice to second parties, and pro-ceed to foreclose the pledge of the said securities herein provided for."

J. E. Robinson, of Denver, Colo., for appellant.

Ivor O. Wingren, of Denver, Colo., for appellee.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and WILLIAMS, District Judge.

WILLIAMS, District Judge (after stating the facts as above). It is assumed for the purpose of this case that, no statute forbidding, and all stockholders agreeing thereto, and no equitable rights of other creditors intervening, the corporation, in assuming or agreeing to pay the indebtedness of the stockholders Weston and Hansen to appellant, same being a valid indebtedness as between said parties, would be bound thereby. 1 Cook on Corporations (8th Ed.) § 3, par. 16. However, will appellant be permitted in bankruptcy, which is a court of equity, administering the law according to its spirit rather than its strict letter, by equitable principles (1 Collier on Bankruptcy [3d Ed.] 39), to participate in distribution of such estate in bankruptcy until creditors whose claims arose subsequent to organization of said corporation, rendered insolvent from its beginning by his designs, have been fully satisfied?

In Duvivier & Co. v. Gallice et al. (2d Circuit) 149 F. 118, 80 C. C. A. 556, relied on by appellant, it was held that a "corporation organized by the members of a partnership, to whom all the stock is issued, to take over all of the property of the partnership and continue its business at the same place, is liable for the debts of the partnership, even though they are not expressly assumed." Duvivier & Co. as a partnership were indebted to Gallice & Co. upon transactions arising whilst the partnership existed, and prior to organization of the corporation contracting such indebtedness, and not appearing to have any relation to the paying in of the capital stock, or its issuance, in such a way as to give such partnership creditor an advantage over subsequent creditors; such corporation acquiring such assets and continuing the business which had theretofore been conducted by said partnership. Neither does it appear, nor is there any suggestion from the opinion or statement of facts, that upon assumption of this indebtedness the corporation was thereby rendered insolvent though it afterwards became a bankrupt. That the assumption of said indebtedness was valid appears to have

not been controverted, the only question being raised or considered being as to amount. The question of any rights or equities in favor of subsequent creditors was neither involved nor considered, although the holding is in general terms. The statement in Remington on Bankruptcy, to which reference is made in appellant's brief, is practically that as stated in Duvivier & Co. v. Gallice, the only case cited in its support.

In Re Stone-Moore-West Co. (D. C.) 292 F. 1004, another case relied on by appellant, it is held that, though a purchase by a corporation of partnership assets does not necessarily involve liability for the partnership obligations, such liability may be agreed on as part of the purchase price. The value of the assets purchased equaled the amount paid or agreed to be paid. In the opinion the court says: "The corporate creditors are no worse off than if the corporation had given the partnership its formal note for the value of the assets taken over."

In York Mfg. Co. v. Brewster (5th Circuit) 174 F. 566, 98 C. C. A. 348, another case cited by appellant, it is held that, where associates, who hold property subject to a lien or under a conditional sale, combine to create a corporation to take over the property, such associates being the only persons who have any substantial interest in the corporation, it stands in no better position than that occupied by the prior holders, citing as authority York v. Cassell, 201 U. S. 344, 26 S. Ct. 481, 50 L. Ed. 782, which holds that a trustee obtained no better title than the bankrupt held, and that the title of the bankrupt could not prevail against a contract or conditional sale, and which was decided before the amendment of 1910.

In Re A. G. Crosby (D. C.) 199 F. 344, also cited by appellant, it is held, where a corporation is organized to take over and continue the business of a partnership, acquiring the partnership assets and assuming the liabilities, and "the partnership was solvent at the time," and the corporation *"continued to be solvent for a considerable time thereafter,* the corporation assets were liable in bankruptcy for a note executed by it to a creditor of the firm to cover a part of the firm's debts so assumed." By implication this case would be an authority, where the corporation was thereby rendered ab initio insolvent and continuing to be insolvent thereafter until adjudication in bankruptcy, for holding that the claim of appellant, the designer and manipulator of such plan, should be deferred until claims of creditors accruing subsequent to its organization, and while insolvent, and before adjudication in bankruptcy, should be fully satisfied.

In Keith v. Kilmer, In re National Piano Company (C. C. A.) 261 F. 733, 9 A. L. R. 1287, it was held: "An executory contract by a corporation for the purchase of its own stock cannot be made the basis of a claim against its estate in bankruptcy, thus permitting the selling stockholder to share with ordinary creditors in the assets." In reaching such conclusion it was assumed that such a contract was sufficiently authorized or ratified, or both, by the directors and stockholders as was required under the state law, and that at the time of the transaction the corporation was solvent, and that it was not (therefore) tainted by fraud in fact, and intent to cheat creditors existing or prospective.

While the laws of Colorado do not require payment of any specified amount of capital to authorize organization of such a corporation and to begin business, section 2273 of the Compiled Laws of Colorado of 1921, makes it the duty of the president and a majority of the directors or trustees, after payment of the last installment of the capital stock fixed and limited by the company, to make a certificate stating the amount of the capital so fixed and paid in, the same to be sworn to and recorded in the office of the secretary of state and a copy filed in the office of the recorder of deeds of the county where the corporation is located. If such statement so filed is false, then such parties are to be jointly and severally liable for all damages arising therefrom. In this case a statement that the capital stock was fully paid up was so filed, but there is nothing in the record to show that any creditor had actual knowledge thereof and thereby relied thereon, but the making and filing of this affidavit at the outset as a part of the transaction is evidence of the painstaking design on part of appellant and his attorney or agent to cause this corporation to be launched in such a way that, though insolvent ab initio, it should have credit; it being contemplated that it should contract debts in order that, though in such insolvent condition, it might operate as a going concern, and add to the stock by purchases on credit extensions, and, whether the business emerged from insolvency, realize on his claim, though at the ultimate expense of such creditors.

[1] Any one, becoming a creditor of a corporation, has a right to rely on the security afforded by the money or assets paid in by the stockholders for its capital stock, and in

a proper case equity will prefer the claims of innocent general creditors over claims of stockholders deceived by officers of a corporation. Scott v. Abbott (8th Circuit) 160 F. 573, 87 C. C. A. 475; American Wood Working Machine Co. v. Norment (4th C. C. A.) 157 F. 801, 85 C. C. A. 165; Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203.

[2] The turning of said properties to the corporation, under such scheme, at such an overvaluation, to the knowledge of all contracting parties, including appellant, and that having the effect of rendering said corporation ab initio insolvent, is evidence tending to prove, in connection with other facts disclosed by the record, fraud on part of appellant. Thompson on Corporations, § 1621; In re Royce Dry Goods Co. (D. C.) 133 F. 100; McLellan v. Detroit File Works, 56 Mich. 579, 23 N. W. 321.

[3] Appellant insisted on selling in a lump sum without an inventory. He was chargeable with the knowledge, as was found by the referee, that the contract price was 2½ times its actual value. The plan designed by him and his attorney or agent provided for organization of such corporation to be controlled by him, without any other financial responsibility as a stockholder or otherwise, and rendering it ab initio insolvent. By incurring debts whilst in such insolvent state, and operated, as contemplated by him, as a going concern, if it did not prosper beyond reasonable expectation, so as to enable it to pay the new creditors as well as himself, thereby emerging from insolvency, its adjudication as a bankrupt was inevitable.

The goods or property, such sale agreed upon at a lump sum of $25,000, were invoiced at cost price, at a little over $8,000. An inventory taken shortly after the corporation was formed showed a value between $8,000 and $10,000. A subsequent appraisement, made after some sales and some accretions, fixed maximum value as between $11,000 and $12,000. The value of the property as actually turned in to the corporation did not amount to exceed $9,000. The balance of the $25,000 was made up of good will, which is shown to have been without value, and a short time lease, which was of negligible value. Fictitious values cannot be given to property on account of such considerations. Actual fair value is not made up of good will to the extent of three-fifths of a business. While a seller may arbitrarily fix his own price for his property, he may not participate in a scheme to turn it into a corporation at such arbitrary excessive value, when he knows that it is worth far less especially under such circumstances as will reasonably work a fraud on prospective and contemplated creditors. Neither the individual purchasers nor the corporation had theretofore been engaged in this business. The corporation did not take over a business which had in good faith incurred debts in due course. Appellant's claim is a part of the scheme devised by him by which the corporation became indebted to an extent of at least double the actual value of its assets, thereby rendered insolvent at its very inception, and which renders him ex delicto to the extent that he should not participate in the distribution of its assets until their claims have been satisfied.

Though a novel question is here presented, yet fundamental principles of honest dealing and sound public policy forbid his receiving any distribution on this claim at expense of such creditors of said corporation. The appellee neither having sought a revisal of the order of the referee by the District Court, in so far as it allowed appellant's claim in the sum of $2,800, nor any relief as to said allowance from this court, but having in his brief here asserted that the "ruling of the referee, as confirmed by the District Judge, allowing the appellant's claim to the extent of $2,800, is correct and should be confirmed," this case is remanded, with instructions to modify the order confirming action of referee in disallowing all of said claim in excess of $2,800, so as to allow the balance, with the proviso as to such balance that the appellant is not to participate in the distribution of the assets of said bankrupt corporation until claims of all other creditors, including said $2,800, as allowed, have been satisfied.